# United States Court of Appeals for the Federal Circuit

---

**MARVA J. SNEED,**
*Claimant-Appellant*

v.

**ROBERT A. MCDONALD, SECRETARY OF VETERANS AFFAIRS,**
*Respondent-Appellee*

---

2015-7069

---

Appeal from the United States Court of Appeals for Veterans Claims in No. 11-2715, Judge William A. Moorman.

---

Decided: April 22, 2016

---

BENJAMIN A. HERBERT, Kirkland & Ellis LLP, Los Angeles, CA, argued for claimant-appellant. Also represented by WILLIAM H. BURGESS, Washington, DC.

RENEE GERBER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent-appellee. Also represented by SCOTT D. AUSTIN, ROBERT E. KIRSCHMAN, JR., BENJAMIN C. MIZER; MEGHAN ALPHONSO, DAVID J. BARRANS, Office of General Counsel, United States Department of Veterans Affairs, Washington, DC.

---

Before PROST, *Chief Judge,* DYK, and WALLACH, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* DYK.

Concurring opinion filed by *Circuit Judge* WALLACH.

DYK, *Circuit Judge.*

The Board of Veterans' Appeals ("Board") denied Marva J. Sneed's claim for dependency and indemnity compensation. The Court of Appeals for Veterans Claims ("Veterans Court") dismissed Ms. Sneed's appeal because it was untimely filed and declined to find equitable tolling based on attorney abandonment. We hold that, even assuming Ms. Sneed showed that there was attorney abandonment, she failed to demonstrate that she diligently pursued her rights. We affirm.

## BACKGROUND

Ms. Sneed's husband, Reginald A. Sneed, served on active duty from June 1964 to June 1968. Mr. Sneed suffered from numerous service-connected disabilities. In January 2001, Mr. Sneed suffered a spinal cord contusion from a fall, which left him quadriplegic and confined to a chin-operated wheelchair. In October 2003, Mr. Sneed was living in a nursing home for paralyzed veterans when a fire broke out, and all of the residents, including Mr. Sneed, died of smoke inhalation.

Following the death of her husband, Ms. Sneed filed a claim for dependency and indemnity compensation under 38 U.S.C. § 1310. Mr. Sneed's service-connected disabilities were alleged to have been principal or contributory causes of his death, *see* 38 C.F.R. § 3.312, based on the theories that Mr. Sneed's service-connected spondylosis and spinal stenosis contributed to his fall and resultant quadriplegia, and that Mr. Sneed's service-connected

posttraumatic stress disorder, tinnitus, and hearing loss prevented him from leaving the nursing home during the fire.

The regional office of the Department of Veterans Affairs ("VA") denied Ms. Sneed's claim, and the Board affirmed. The Board's decision was mailed to Ms. Sneed on April 5, 2011. Ms. Sneed's notice of appeal to the Veterans Court was due on August 3, 2011, 120 days after the Board mailed its decision. 38 U.S.C. § 7266(a).

On April 13, 2011, well within the 120-day period, Ms. Sneed contacted a lawyer, Katrina J. Eagle, requesting that Ms. Eagle represent her in an appeal to the Veterans Court. According to Ms. Sneed, at the request of Ms. Eagle's secretary, she transmitted case materials to Ms. Eagle's office by mail and fax, and had several oral communications with Ms. Eagle's office. The record does not describe the exact nature of the material transmitted or the substance of the communications. On August 2, 2011, Ms. Sneed received a letter from Ms. Eagle. In her letter, Ms. Eagle provided an assessment of Ms. Sneed's service connection claim, explaining her view that the claim "does not meet the criteria under 38 C.F.R. § 3.312," and concluded, "I do not believe the VA erred in denying your claim; thus, I will not be able to represent you for any subsequent appeal for entitlement to service connection for the cause of death, and for [dependency and indemnity compensation] benefits."[1] J.A. 53.

---

[1]  Ms. Eagle's assessment was based on the Board's conclusion that "the immediate cause of [Mr. Sneed's] death was smoke inhalation" and "not . . . a result of a service-connected disability, nor did a service-connected disability cause or contribute substantially or materially to his death." J.A. 16.

Ms. Eagle further stated, "[y]ou are free to seek another opinion from another attorney, of course. Moreover, you are not required to have an attorney to proceed before the Court. However, should you decide to appeal the Board's adverse decision, you must file your Notice of Appeal *no later than August 5, 2011*." J.A. 53–54. The August 5 statement was erroneous; the correct deadline was August 3, the next day following Ms. Sneed's receipt of Ms. Eagle's letter. Ms. Sneed stated that, between August 2 and August 31, 2011, she contacted at least fourteen lawyers, who all turned down her case. Having failed to secure a lawyer to take her case, Ms. Sneed filed the notice of appeal herself on September 1, 2011—twenty-nine days after the deadline.

On September 7, 2011, Ms. Sneed sent a letter to the Veterans Court explaining her late filing. On June 14, 2012, the Veterans Court ordered Ms. Sneed to file a response discussing whether the circumstances in her case warranted equitable tolling of the 120-day deadline. In September 2012, the Veterans Court dismissed Ms. Sneed's appeal as untimely filed, finding that equitable tolling did not apply because "the circumstances leading up to her late NOA are not extraordinary, but rather evidence general negligence or procrastination." *Sneed v. Shinseki ("Sneed I")*, No. 11-2715, 2012 WL 4464874, at *2 (Vet. App. Sept. 27, 2012). The Veterans Court distinguished Ms. Sneed's argument for tolling from "circumstances [that] precluded a timely filing [justifying equitable tolling,] . . . such as (1) mental illness[,] . . . (2) reliance on the incorrect statement of a VA official, or (3) a misfiling at the regional office or the Board." *Id.* at *2 (internal quotation marks and citations omitted).

On appeal we vacated and remanded. *Sneed v. Shinseki ("Sneed II")*, 737 F.3d 719, 728–29 (Fed. Cir. 2013). We held that "attorney abandonment may justify equitably tolling the filing deadline in appeals to the Veterans Court." *Id.* We also found, as the government

conceded during oral argument in the first appeal, that the Veterans Court had not made any explicit findings with respect to diligence. *Id.* at 724.

On remand, Ms. Sneed argued that the Veterans Court should find attorney abandonment by Ms. Eagle, warranting equitable tolling of Ms. Sneed's deadline to file her notice of appeal. In October 2014, the Veterans Court again held that equitable tolling of the statutory deadline was not warranted. *Sneed v. McDonald* ("*Sneed III*"), No. 11-2715, 2014 WL 5365571, at *1 (Vet. App. Oct. 22, 2014), *available at* J.A. 1–10. The Veterans Court concluded that there was no attorney abandonment "absent an agreement [between Ms. Eagle and Ms. Sneed] to represent [Ms. Sneed] or file the NOA." J.A. 8. The Veterans Court also held that Ms. Sneed did not act diligently in pursuing her appeal rights. Ms. Sneed appealed. We have jurisdiction under 38 U.S.C. § 7292.

## DISCUSSION

### I

Section 7292 of title 38 provides that we "shall decide all relevant questions of law" arising from appeals from decisions of the Veterans Court, but, "[e]xcept to the extent that an appeal . . . presents a constitutional issue, [we] may not review (A) a challenge to a factual determination, or (B) a challenge to a law or regulation as applied to the facts of a particular case." 38 U.S.C. § 7292(d)(1), (d)(2). Though the "question whether equitable tolling applies in a particular case often involves, in part, the application of law to fact, . . . when the material facts are not in dispute and the adoption of a particular legal standard would dictate the outcome of the equitable tolling claim, this court has treated the question of the availability of equitable tolling as a matter of law that we are authorized by statute to address." *Bailey v. Principi*, 351 F.3d 1381, 1384 (Fed. Cir. 2003); *see also Santana-Venegas v. Principi*, 314 F.3d 1293, 1298 (Fed. Cir. 2002).

There is no dispute here as to the relevant facts, so the issue presented is one of law, a matter within our jurisdiction.

## II

In *Henderson v. Shinseki*, the Supreme Court held that "the deadline for filing a notice of appeal with the Veterans Court [under 38 U.S.C. § 7266(a)] does not have jurisdictional attributes, [though] [t]he 120-day limit is nevertheless an important procedural rule." 562 U.S. 428, 441–42 (2011). Although the Supreme Court did not decide whether equitable tolling of the statutory deadline was available, *see id.* at 442 n.4, after *Henderson*, we have held that the 120-day deadline in § 7266(a) is subject to equitable tolling. *See, e.g.*, *Sneed II*, 737 F.3d at 728; *see also Checo v. Shinseki*, 748 F.3d 1373, 1378 (Fed. Cir. 2014).

"A litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way" and prevented timely filing. *Sneed II*, 737 F.3d at 725 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)); *see also Menominee Indian Tribe of Wis. v. United States*, 136 S. Ct. 750, 755 (2016) (explaining that the "diligence prong . . . covers those affairs within the litigant's control; the extraordinary-circumstances prong, by contrast, is meant to cover matters outside its control"). "Equitable tolling's two components [are] 'elements,' not merely factors of indeterminate or commensurable weight." *Menominee Indian Tribe*, 136 S. Ct. at 756 (citation omitted).

Although attorney abandonment may support equitable tolling,[2] attorney negligence is not sufficient to justify equitable tolling. To the contrary, the client is normally responsible for the malfeasance of the attorney, and in such cases has a malpractice remedy, not a tolling remedy. *See Maples v. Thomas*, 132 S. Ct. 912, 922 (2012) ("[U]nder well-settled principles of agency law, the principal bears the risk of negligent conduct on the part of his agent.") (internal quotation marks and citation omitted). Equitable tolling does not extend to "a garden variety claim of excusable neglect, such as a simple miscalculation that leads a lawyer to miss a filing deadline." *Sneed II*, 737 F.3d at 727 (quoting *Holland v. Florida*, 560 U.S. 631, 651–52 (2012)).[3] The Supreme Court has held, for example, that a litigant's failure to file a Title VII claim within the statutory period set by 42 U.S.C. § 2000e–16(c) after receipt of an EEOC decision cannot be excused based on her lawyer's absence from his office at the time that the agency notice was received. *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990). Attorney abandonment, under which "a client cannot be charged with the acts or omissions of an attorney who has abandoned him," *Maples*, 132 S. Ct. at 924, is a narrow exception to the usual rule.

---

[2] *See Sneed II*, 737 F.3d at 728 (citing *Maples v. Thomas*, 132 S. Ct. 912 (2012); *Holland v. Florida*, 560 U.S. 631 (2010)).

[3] Unrepresented litigants also routinely face conditions that, while challenging, are not "extraordinary." *See Menominee Indian Tribe*, 136 S. Ct. at 757 ("[I]t is common for a litigant to be confronted with . . . limited financial resources, an uncertain outcome based on an uncertain legal landscape, and impending deadlines. These circumstances are not 'extraordinary.'") (internal quotation marks and citations omitted).

## III

The Veterans Court found that attorney abandonment had not been established because an attorney-client relationship did not exist between Ms. Sneed and Ms. Eagle. "[L]acking" from Ms. Sneed was any "declar[ation] that a written agreement for legal services existed between her and Ms. Eagle. She does not declare she entered into a written retainer agreement with her or even that an oral contract of some sort was formed. [Ms. Sneed] does not declare she was ever billed by or made payments to Ms. Eagle or that she agreed to make any payment . . . ." J.A. 7. In short, the Veterans Court concluded that there were no extraordinary circumstances justifying equitable tolling because "[n]either [Ms. Sneed's] statement nor her attached exhibits and evidence indicate the existence of an (explicit or implicit) attorney-client relationship between herself and Ms. Eagle after issuance of the April 2011 Board decision." J.A. 8.

Both Ms. Sneed and Ms. Eagle reside in California, and the parties here agree that California law controls on the issue of whether an attorney-client relationship existed. As the government points out, California requires an express or implied contract to create an attorney-client relationship. *See, e.g.*, *Responsible Citizens v. Superior Court*, 16 Cal. App. 4th 1717, 1732 (1993). But it is also true that California appears to give a very liberal construction of the implied contract requirement. Thus, for example, an undertaking by a lawyer to provide legal advice or the giving of actual advice as to a course of action is sufficient, even though the attorney and prospective client had never entered into a formal agreement for representation. Under California law, it is clear that neither the absence of an agreement as to services and fees, nor the preliminary nature of Ms. Sneed's and Ms. Eagle's communications, precluded the formation of an attorney-client relationship. *See, e.g.*, *People ex rel. Dep't*

*of Corps. v. SpeeDee Oil Change Sys., Inc.*, 980 P.2d 371 (Cal. 1999).

In *SpeeDee*, the California Supreme Court declared that "[t]he fiduciary relationship existing between lawyer and client extends to preliminary consultations by a prospective client with a view to retention of the lawyer, although actual employment does not result. . . . The absence of an agreement with respect to the fee . . . does not prevent the relationship from arising." *Id.* at 379–80 (internal quotation marks and citations omitted). Rather, the relationship is created when "the attorney knowingly obtains material confidential information from the client and renders legal advice or services as a result." *Id.* at 380, 382–83; *see also Perkins v. W. Coast Lumber Co.*, 62 P. 57, 58 (Cal. 1900) ("When a party seeking legal advice consults an attorney at law, and secures that advice, the relation of attorney and client is established prima facie."); 7 Cal. Jur. 3d Attorneys at Law § 170 (2015).

Similarly, in *Miller v. Metzinger*, the California Court of Appeal held that "an attorney-client relationship giving rise to fiduciary obligations" could arise where an attorney "undertook to obtain . . . records necessary to an evaluation of [a legal claim] and to advise concerning appropriate action to be taken." 91 Cal. App. 3d 31, 40 (1979); *see also Perkins*, 62 P. at 58 (the lawyer "advised the [client] . . . not to file for record . . . any claim of lien"). Thus the attorney's statements that "his function was purely investigatory and that he did not agree to represent [the client], charge any fee for his services or secure a retainer agreement" did not preclude the existence of an attorney-client relationship. *Miller*, 91 Cal. App. 3d at 39.

Here, there was no evidence that Ms. Eagle agreed to provide an evaluation of the case, nor did she provide any evaluation until she declined to represent Ms. Sneed and explained her reasons for doing so. There is, as well, no evidence that Ms. Sneed provided confidential materials

to Ms. Eagle. The California cases do not address whether accepting non-confidential materials in order to consider a case and providing an evaluation of the case while declining representation creates an attorney-client relationship. We need not decide whether, under California law, there is an attorney-client relationship in such circumstances. Nor do we decide whether, assuming that an attorney-client relationship was formed, there can be attorney abandonment satisfying the extraordinary circumstance requirement when the attorney did not undertake the representation.

Even assuming there was attorney abandonment, Ms. Sneed does not satisfy the diligence prong. *See Pace*, 544 U.S. at 418 ("Even if we were to accept petitioner's theory [that he satisfied the extraordinary circumstance test], he would not be entitled to relief because he has not established the requisite diligence."); *see also Menominee Indian Tribe*, 136 S. Ct. at 756, 757 n.5 (holding that "equitable tolling's two components [are] 'elements,'" and noting that "[b]ecause we hold that there were no extraordinary circumstances, we need not decide whether the Tribe was diligently pursuing its rights") (citation omitted); *Lawrence v. Florida*, 549 U.S. 327, 336–37 (2007) (rejecting equitable tolling without addressing diligence because petitioner fell "far short of showing 'extraordinary circumstances'").

The reasonable diligence element demands a showing of diligence during the alleged extraordinary circumstance period. *See Checo*, 748 F.3d at 1380 (holding that the party "must only demonstrate due diligence during the extraordinary circumstance period" of her homelessness). Under *Checo*'s "stop-clock approach," if diligence is shown, the 120-day filing period would be tolled during the extraordinary circumstance period and resume running when the extraordinary circumstance ended. *Id.* Ms. Sneed, then, was required to show reasonable diligence between April 13, 2011, when Ms. Eagle allegedly began

representing her, and August 2, 2011, when Ms. Eagle allegedly abandoned her.

While "[a] client [cannot] be faulted for failing to act on [her] own behalf when [she] lacks reason to believe [her] attorneys of record, in fact, are not representing [her]," *Maples*, 132 S. Ct. at 924, Ms. Sneed had reason to suspect that Ms. Eagle was not representing her. Where the attorney has not undertaken the representation, reasonable diligence requires that the client check with the attorney before the statutory filing time is about to run out to confirm that the attorney will undertake the representation. There is no suggestion that Ms. Sneed did this. The Veterans Court found that Ms. Sneed "asserts that she assumed that Ms. Eagle would file the NOA for her and . . . does not state that she took any action during the 120-day period to confirm that . . . an appeal had been filed with this Court." J.A. 9.

Ms. Sneed's activity during the statutory period stands in contrast to the situations in the Supreme Court's decisions in *Holland* and *Maples*. In *Holland*, a prisoner's lawyer missed the statutory deadline to file a federal habeas petition under 28 U.S.C. § 2244(d)(1)(A), despite the prisoner's repeated requests and reminders to his attorney to file the petition. 560 U.S. at 652.[4] The

---

[4]    In *Holland*, the Court found that

[the attorney] failed to file [the prisoner's] federal petition on time despite [the prisoner's] many letters that repeatedly emphasized the importance of his doing so. [The attorney] apparently did not do the research necessary to find out the proper filing date, despite [the prisoner's] letters that went so far as to identify the applicable legal rules. [The attorney] failed to inform [the prisoner] in a timely manner about the crucial fact that the Florida

prisoner "not only wrote his [appointed] attorney numerous letters seeking critical information and providing direction; [but] also contacted state courts, their clerks, and the [state] Bar Association in an effort to have [his attorney]—the central impediment to the pursuit of his legal remedy—removed from his case. And the very day that [the prisoner] discovered that his AEDPA clock had expired due to [his attorney's] failings, [the prisoner] prepared his own habeas petition *pro se* and promptly filed it with the District Court." *Id.* at 653. The Court held that the prisoner had satisfied the diligence requirement and remanded for a determination on the issue of extraordinary circumstances. *Id.* at 653–54.

In *Maples*, the issue was whether there was "cause" to excuse a state procedural default under *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). 132 S. Ct. at 922. The Court found that attorney abandonment constituted "cause." *Id.* at 924. While the case did not involve equitable tolling, the Court's analysis is nonetheless pertinent, as recognized in *Sneed II*. *See* 737 F.3d at 728. In *Maples*, a prisoner on death row was represented by two out-of-state *pro bono* attorneys. 132 S. Ct. at 918. With their aid, the prisoner filed a petition for postconviction relief in state court. *Id.* After the petition was filed, both attorneys left the firm, but neither informed their client of their departure or of their inability to continue to represent him. *Id.* at 919. Upon denying the prisoner's petition, the trial court sent copies of its order to the prisoner's counsel

---

Supreme Court had decided his case, again despite [the prisoner's] many pleas for that information. And [the attorney] failed to communicate with his client over a period of years, despite various pleas from [the prisoner] that [his attorney] respond to his letters.

560 U.S. at 652.

of record, but no copy was sent or was forwarded to the prisoner. *Id.* at 920. Without knowledge of the trial court's action, and "[g]iven no reason to suspect that he lacked counsel able and willing to represent him," the prisoner missed his 42-day deadline, under Rule 4(a)(1) of the Alabama Rules of Appellate Procedure, to file a notice of appeal from the trial court's order denying postconviction relief. *Id.* The Supreme Court concluded that attorney abandonment had been established, finding that the prisoner had no basis to believe that his petition had been denied or that he was unrepresented. *Id.* at 927.

The opposite situation was true for Ms. Sneed. Unlike the prisoner in *Maples*, she received notice of the filing deadline. Unlike the prisoner in *Holland*, she did nothing to ensure that the person she had asked to represent her was acting to make the necessary filing. The Veterans Court did not err in holding that Ms. Sneed did not act diligently. The absence of diligence is particularly clear here because Ms. Eagle had never before represented Ms. Sneed and had not agreed to represent her in the appeal or to file a notice of appeal. Ms. Sneed's failure to confirm that Ms. Eagle would be acting on her behalf and that she had filed a notice of appeal precludes a finding of reasonable diligence. The fact that Ms. Sneed thought that Ms. Eagle had agreed to represent her cannot excuse her lack of diligence given the want of any objective basis for such an assumption.

Because Ms. Sneed did not demonstrate that she had been diligently pursuing her rights, the Veterans Court did not err in holding that equitable tolling is not available.

## AFFIRMED

### COSTS

No costs.

# United States Court of Appeals
# for the Federal Circuit

_____

**MARVA J. SNEED,**
*Claimant-Appellant*

**v.**

**ROBERT A. MCDONALD, SECRETARY OF
VETERANS AFFAIRS,**
*Respondent-Appellee*

_____

2015-7069

_____

Appeal from the United States Court of Appeals for
Veterans Claims in No. 11-2715, Judge William A. Moorman.

_____

WALLACH, *Circuit Judge*, concurring in the result.

The doctrine of equitable tolling "pauses the running
of, or 'tolls,' a statute of limitations." *Lozano v. Montoya
Alvarez*, 134 S. Ct. 1224, 1231 (2014) (citation omitted).
"[A] litigant seeking equitable tolling bears the burden of
establishing two elements: (1) that he has been pursuing
his rights diligently, and (2) that some extraordinary
circumstance stood in his way." *Pace v. DiGuglielmo*, 544
U.S. 408, 418 (2005) (citation omitted). An attorney's
abandonment of a client may constitute extraordinary
circumstances. *See Sneed v. Shinseki*, 737 F.3d 719, 726–
27 (Fed. Cir. 2013). The existence of an attorney-client
relationship is a condition precedent to a finding of aban-
donment. *See Maples v. Thomas*, 132 S. Ct. 912, 922–23

(2012) (explaining that attorney abandonment may arise when an attorney severs an existing relationship with a client).

The majority concludes that the doctrine of equitable tolling is not available to Appellant Marva J. Sneed. Maj. Op. at 13. In reaching its conclusion, the majority does not decide whether the United States Court of Appeals for Veterans Claims ("Veterans Court") committed a legal error when it found that, under California law, no attorney-client relationship existed between attorney Katrina Eagle and Ms. Sneed and that, consequently, no extraordinary circumstances prevented Ms. Sneed from appealing to the Veterans Court. *Id.* at 10.

I write separately because the Veterans Court's extraordinary circumstances analysis is legally defective. The Veterans Court applied an improperly narrow legal standard in assessing whether an attorney-client relationship existed between Ms. Eagle and Ms. Sneed. Despite that error, I agree with the majority that the court should not provide any relief to Ms. Sneed because she did not diligently pursue her right to appeal to the Veterans Court.

## I.

Ms. Sneed contends that the Veterans Court misapplied California law when it determined that no attorney-client relationship existed between her and Ms. Eagle, which in turn meant that Ms. Sneed could not claim attorney abandonment as a basis for extraordinary circumstances. Ms. Sneed principally raises two arguments: (1) "the Veterans Court relied on an erroneous view of California law[1] regarding attorney-client relationships,"

---

[1]    "Both Ms. Sneed and Ms. Eagle reside in California, and the parties here agree that California law con-

Appellant's Br. 23 (capitalization modified); and (2) the Veterans Court "erred by substituting California's legal technicalities for the equitable judgment the tolling inquiry requires," *id.* at 30 (capitalization modified). I agree with Ms. Sneed's first argument.

The Veterans Court articulated an incomplete and, thus, improperly narrow legal standard for determining when an attorney-client relationship exists under California law. It correctly found that (1) a contract is required to establish an attorney-client relationship and (2) a contract can be express or implied-in-fact. *Sneed v. McDonald* (*Sneed III*), No. 11-2715, 2014 WL 5365571, at *4 (Vet. App. Oct. 22, 2014) (citing *Responsible Citizens v. Superior Court*, 20 Cal. Rptr. 2d 756, 766 (Cal. Ct. App. 1993)). Although the Veterans Court recognized an implied-in-fact contract could be created by the parties' conduct, *id.*, it failed to consider that an attorney's provision of legal advice may constitute the required conduct.

Over a century ago, the Supreme Court of California provided a broad standard for determining when an implied-in-fact contract may arise between an attorney and a client. It stated that "[w]hen a party seeking legal advice[2] consults an attorney at law, and secures that

---

trols on the issue of whether an attorney-client relationship existed." Maj. Op. at 8.

    ²   Neither the legislature nor the courts of California have expressly defined what constitutes "legal advice." However, the California State Bar Committee on Professional Responsibility and Conduct has stated that legal advice includes "that which requires the exercise of legal judgment beyond the knowledge and capacity of the lay person," such as when an attorney "mak[es] a recommendation about a specific course of action to follow." Cal. State Bar Comm. on Prof'l Responsibility & Conduct, Formal Op. 2003-164, 2003 WL 23146203, at *4 (2003)

advice, the relation of attorney and client is established prima facie." *Perkins v. W. Coast Lumber Co.*, 62 P. 57, 58 (Cal. 1900). In the decades that followed, the Supreme Court of California and the California Courts of Appeal have cited this passage favorably and expanded upon it in deciding whether an implied-in-fact contract gave rise to an attorney-client relationship. *See, e.g., People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 980 P.2d 371, 379–80 (Cal. 1999); *Beery v. State Bar of Cal.*, 739 P.2d 1289, 1293 (Cal. 1987); *Benninghoff v. Superior Court*, 38 Cal. Rptr. 3d 759, 766 (Cal. Ct. App. 2006); *Gulf Ins. Co. v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone*, 93 Cal. Rptr. 2d 534, 542 (Cal. Ct. App. 2000); *Miller v. Metzinger*, 154 Cal. Rptr. 22, 39 (Cal. Ct. App. 1979).

*SpeeDee* is particularly instructive in assessing when legal advice is sufficient to establish an attorney-client relationship under *Perkins*. *SpeeDee* concerned "whether an attorney-client relationship ha[d] reached a point where the attorney can be subject to disqualification for a conflict of interest."[3] 980 P.2d at 379. In that decision, the California Supreme Court held that an attorney-client relationship may arise from a preliminary consultation by

---

(internal quotation marks, brackets, citation, and footnote omitted).

[3] Although *SpeeDee* did not address the existence of an attorney-client relationship for purposes of attorney abandonment, California courts have considered the factors articulated in *Perkins* and its progeny in a number of contexts. *See, e.g., Streit v. Covington & Crowe*, 98 Cal. Rptr. 2d 193, 196 (Cal. Ct. App. 2000) (discussing *Miller* in the context of legal malpractice). Indeed, the Veterans Court relied upon *Responsible Citizens* in its analysis, which concerned attorney disqualification for a conflict of interest. *See* 20 Cal. Rptr. 2d at 761.

a prospective client who seeks, and receives, legal advice, even though no formal agreement for representation results.[4] *See id.* at 379–80.

The Veterans Court committed error because it did not consider whether the August 2, 2011 letter[5] from Ms. Eagle to Ms. Sneed constituted legal advice sufficient to establish an implied-in-fact attorney-client contract under *Perkins* and its progeny. Indeed, the Veterans Court did not discuss *Perkins* or *SpeeDee* in its analysis, *see Sneed III*, 2014 WL 5365571, at *3–7, despite Ms. Sneed's argument that her communications with Ms. Eagle resulted in an attorney-client relationship, *see* J.A. 80 (Appellant's Memorandum of Law in Response to the Veterans Court's Order of Mar. 31, 2014, where she quoted *Beery* for the proposition that, when "a party seeking legal advice consults an attorney at law and secures that advice, the relation of attorney and client is established prima facie"

---

[4] This conclusion is sensible in light of an attorney's duty under California law to advise individuals who reasonably believe they are clients that they are, in fact, not clients. *See Butler v. State Bar of Cal.*, 721 P.2d 585, 589 (Cal. 1986).

[5] As the majority observes, in that letter

Ms. Eagle provided an assessment of Ms. Sneed's service connection claim, explaining her view that the claim "does not meet the criteria under 38 C.F.R. § 3.312," and concluded, "I do not believe the VA erred in denying your claim; thus, I will not be able to represent you for any subsequent appeal for entitlement to service connection for the cause of death, and for [dependency and indemnity compensation] benefits."

Maj. Op. at 3 (footnote omitted) (quoting J.A. 53).

(quoting 739 P.2d at 1293)).[6] Thus, because the Veterans Court did not even *consider* whether the contents of the letter in question amounted to legal advice sufficient to establish an attorney-client relationship,[7] it applied an improperly narrow legal standard in its analysis.

## II.

Despite the improperly narrow legal standard applied by the Veterans Court, I agree with the majority that we cannot assess the merits of Ms. Sneed's claim for compensation because Ms. Sneed did not diligently pursue her right to appeal to the Veterans Court. Maj. Op. at 13. Nevertheless, as the majority recognizes, Ms. Sneed may have another remedy at her disposal. *See id.* at 7 (citing *Maples*, 132 S. Ct. at 922) (explaining that, under general principles of agency law, attorney malfeasance may give rise to a malpractice remedy).

---

[6] The passage from Ms. Sneed's Memorandum raises doubt as to whether the Veterans Court's properly concluded that Ms. Sneed "d[id] not assert that Ms. Eagle provided any advice to" her. *Sneed III*, 2014 WL 5365571, at *6.

[7] To be sure, if the letter from Ms. Eagle stated only that she would not represent Ms. Sneed, there would be no dispute that an attorney-client relationship had not formed between them. However, in addition to declining to represent Ms. Sneed, the letter also contains legal analysis and advice. J.A. 53–54. The additional content suggests that Ms. Sneed sought legal advice from Ms. Eagle and secured it, even though Ms. Eagle ultimately declined to represent her. The additional content thus warrants an analysis under *Perkins*.